BRUNOT, J.
 

 This is a suit for divorce on the ground of adultery and for the care and custody of two minor children, the issue of the marriage.
 

 From a judgment in favor of the plaintiff decreeing a divorce a vinculo matrimonii and awarding the plaintiff the custody of the children, the defendant appealed.
 

 There are no intricate problems or legal questions involved in this ease, and therefore the proper determination of it merely requires a careful reading and correct appreciation of the evidence. As a rule, when only questions of fact are presented, the conclusions of the trial judge thereon are entitled to great weight. This rule is based upon the assumption that the facts were carefully reviewed in the court below. In this case the reasons assigned for judgment are as follows:
 

 “It is impossible to review the facts,’but I am of the opinion that plaintiff has the preponclering share of the evidence and is entitled to a judgment as prayed for.”
 

 These reasons do not impress us as being sufficiently conclusive to bring the learned judge’s finding of fact within the rule announced.
 

 The petition charges two acts of adultery. One is alleged to have been committed on October 6, 1923, and the other on October 22, 1923, and it names Mrs. Nettie Daigle as corespondent.
 

 The record discloses that the plaintiff left the matrimonial domicile without sufficient cause. There is some evidence that the domestic relations were not always peaceful; but there is no proof of any act on the part of either spouse of such a naturfe as would justify a separation. The plaintiff, in giving a reason for leaving her husband, says:
 

 “I told him I was going, it was on the Sunday before, I told him that I did not love him any more, and it was about a week or so after I went up home, and I took the two children and told him I was going to my mother’s home, and I said to him, ‘If. I stay, I will not be true to you,’ and he said, ‘What do you say?’ and I said, ‘If I stay I will not be true to you.’ ”
 

 After leaving her husband, plaintiff secured the services of Woodville & Woodville, attorneys at law, to secure a divorce for her. Mr. J. A. Woodville, one of the firm of Woodville & Woodville, wrote a letter to the defendant. The record does not disclose the exact purport of this letter. The defendant did not answer it. After waiting a reasonable time for a reply, Mr. Wood-ville called upon the defendant, and, while on the stand as a witness in the case, he was asked to explain this visit. His explanation follows:
 

 “I thought maybe he would not want to fight it, and he might say, ‘Mr. Woodville, file your suit, and I will not make any defense.’ ”
 

 An outstanding fact in the record which gravely impresses us is that the pdaintiff or her brother, with the knowledge of her counsel, after failing to secure a consent decree,, adopted a policy which they hoped would lead to the entrapping of defendant and present grounds for an absolute divorce. This policy included the employment of detectives, and, while the connection with it of a woman by the name of Edna Blanchard is not clearly established, the conduct of this woman leaves no doubt in our mind that she was fully informed of plaintiff’s purpose and lent her aid to the promotion of it. It was upon her invitation that defendant attended the party at the Brandt house, No. 2629 Hawthorne street, on October 6th, and it "was also upon her invitation that Mrs. Nettie Daigle attended that party. The defendant was taken to the party in an automobile with Edna Blanchard, Mrs. Daigle,
 
 *51
 
 and two other gentlemen. It is true the party was a booze fest, as all of the participants drank and danced, but the only evidence of the commission of an act by the defendant which would authorize the granting of a divorce was given by a man named D. D. Bishop. Bishop and another detective named Jos. T. Outlaw, were employed on October 5, 1923, and were instructed to go to the Brandt house the following night and observe the movements of the defendant. Outlaw was present on the occasion mentioned, and the testimony shows that, although .Bishop did not appear at the place, he nevertheless reported that he observed the defendant, through a certain window of the house, in a compromising position- with a woman. When the case was called for trial he gave this testimony. The ease was laid over, and in the interim defendant’s counsel had a photograph taken of a man of the same height of Bishop, who was placed at the point near the window where Bishop said he was standing when he claimed to have seen the parties. The photograph shows that the bottom ledge of the window is about one foot higher than the top of the detective’s head. The detective Outlaw says that he declined to make a report or testify for plaintiff, because he knew that the whole thing was a frame-up, and there was nothing on which to make a report. This witness says that he was afterwards called to Mr. Woodville’s office, and they wanted him to rope Mr. Schwartz in. The witness says:
 

 “And they talked to me about working the ease for them, and Mr. Tranchina told me that whatever the expenses were it made no difference to him he would pay for it, and would pay me for my services rendered during the time that I was at the office.”
 

 The foregoing is a summing up of the testimony concerning the alleged adulterous connection on October 6, 1923.
 

 Another similar party was staged for October 22, 1923, at which there was also considerable dancing and drinking. On this occasion, at about midnight, and as the party was about to break up, Mr. John A. Wood-ville, one of plaintiff’s attorneys, and a Mr. Julius H. Weiner, appeared on the scene. They entered the house and proceeded to a room at the rear of the dance hall. They say that when they entered this room the defendant and Mrs. Daigle were alone in the room and on the bed together in a compromising position. They say that defendant admitted his indiscretion and consented to the entry of a decree of divorce, provided his wife would not ask for alimony. Four or five witnesses testify that the room in question was constantly open, that it led to the bathroom, and that guests were passing back and forth to and from the bathroom at all times. Four witnesses, including the defendant and Mrs. Daigle, testify that they were in the room when Mr. Woodville and Mr. Weiner entered it. They say that Mrs. Daigle was arranging her hair, preparatory to leaving the party, and that nothing improper occurred in that room. It is true that the testimony is conflicting; but when the photograph in the record, the diagram of the premises, the unusual if not reprehensible method adopted for securing testimony, the evidence of three witnesses who testify that the detective Bishop, who was the sole witness that saw the defendant in a compromising situation with a woman on October 6, 1923, admitted that he knew nothing of the matter, are considered, we are at a loss to understand how the trial judge could have reached the conclusion that there was ,a preponderance of evidence in favor of the plaintiff.
 

 With reference to the testimony of Detective Bishop, the witnesses we have referred to say:
 

 • “We were not there but a short time when Mr. Bishop came in, and he told us that he had been promised $15 to make a report on what
 
 *53
 
 was supposed to have happened on October 6th, and so he told us that Edna Blanchard had offered him $15' to make a report of what happened, and he told us that he did not know Schwartz, and he did not know where this place was until Edna Blanchard had taken him out there in a taxi, let him out, and he walked to the house about 100 feet further off and made an investigation, and he said he got back in the taxi and rode back towards town, and before he got back it was discovered that he made an investigation of the wrong house, so they started back, and they passed the rear of the house. * * * And from the data he got from Edna Blanchard he wrote the report. * * * Edna Blanchard had a report and said, ‘That will not do; sign this one,’ and he-said that he signed it, that he did not even read all of it, but he signed it, and finally he told us he was called to Mr. Woodville’s office, and Mr. Woodville said to him, T see that son of a gun is going to make a fight, and we need you and need your evidence,’ and he said that if he did not testify in their behalf they would lose the case. *
 
 *
 
 * He finally said that on the morning of the trial Mr. Woodville came to him and told him to go to Edna Blanchard and ask her to tell him what he should say, paid him, and the case went over.”
 

 There is other testimony of a similar character in the record, and, in summing up the entire testimony, we have reached the conclusion that plaintiff has failed to make out her case.
 

 The case of Caserta v. Oaserta, 153 La. 990, 96 So. 834, can have no application to the facts of this ease.
 

 The defendant, in an abundance of precaution, cites the doctrine of connivance. There are no Louisiana cases directly in point on this doctrine, but in Bourgeois v. Ghauvin, 39 La. Ann. 216, 1 So. 679, this court said:
 

 “This evidence need not be detailed; but, taken in connection with his conduct on the occasion above referred to in March, 1884, it strongly indicates an intention to have his wife transgress, or at least an intention to allow her to do so undisturbed and unprevented, which amounts to connivance and operates as a bar to the suit.”
 

 For these reasons it is ordered that the judgment appealed from be reversed and this suit dismissed, at plaintiff’s cost.
 

 O’NIELL, O. J., dissents.